May it please the court, Deputy Federal Public Defender Lauren Collins on behalf of Petitioner Appellant Juan Alvarez. Mr. Alvarez has suffered from severe mental impairments, delusions, psychosis, hallucinations caused by a psychotic disorder which is related to an extreme form of thyroid disease. This case presents two related claims both associated with Mr. Alvarez's mental incompetency at his trial. I'd like to start with the substantive incompetency claim, the claim that he was in fact incompetent at trial and then proceed to the ineffective assistance claim. On habeas, Mr. Alvarez presented several pieces of evidence to support his claim that he did not have the present ability to consult with his lawyer to a reasonable degree of rational understanding and a him. Some of that evidence comes in the form of the expert declaration of Dr. Nathan Labid who found that, who reviewed over 10 years of medical records and concluded that Mr. Alvarez suffers from this thyroid condition that contributes to these extreme psychotic symptoms. So as I understood it, this was all in 2012, 2013 that that report was done and the trial was in 02? Correct, your honor. So the 10 years of records, what records were there that were reviewed prior to 02? So the records prior to 02 consists of some jail medical records and but, and excuse me, not prior to 02, but the earliest records that we have that are medical records are the jail records. So post 02? 02 and 03. So contemporaneous with trial. So, and there are some suggestion in those records that at the time while he was awaiting trial, Mr. Alvarez was treated for this thyroid disease. There's, there's plenty of evidence in the record that the thyroid condition, this, this severe form of Graves disease or thyroid toxicosis, at least the, the hyperthyroidism was present at the time. So there was some anxiety attacks. There's some reference to anxiety attacks, but then about seven months after Mr. Alvarez went to state prison, then he was admitted to the psychiatric hospital for the first of several hospitalizations. The evidence of real psychosis after the conviction is very, very strong. The evidence of psychosis at the time of trial sufficient to make him incompetent. That's a little trickier. I understand your concern, Your Honor. I think in this case where the medical condition, the underlying medical condition, which is this thyroid, thyroid toxicosis, or this thyroid disease, which is causing the psychiatric symptoms is present and fully manifested at the time of trial. And it's the same condition. It's, it's just. How was it manifested at the time of trial? What's in the record to show the manifestation? Mr. Alvarez testified that he has this medical condition, the thyroid problem. He said that it creates insomnia and he doesn't, he didn't drink alcohol because of it. There's also evidence in the record that trial counsel's opening statement says, you know, you'll see something like, paraphrasing here, you'll see Mr. Alvarez and he moves a little weird. He's a little nervous, but that's who he is. And so the thyroid condition was definitely in effect at the time of trial. What do we do with the evidence from his attorney at the time, Montanus, who tells us afterwards in his declaration that this guy was fine? I had no evidence whatsoever that he was having trouble. Disbelieve it because this is a lawyer defending his own reputation. Well, it's certainly something to consider, but there's also other evidence that, that, that casts doubt on that. There is, there were two other counsel who represented Mr. Alvarez before trial. Both of them noticed at least something related to his mental health. Well, they both thought he was a little nuts. I think they expected him to be more or less like that. Yes. So, so those two prior counsel, and there's also the probation report that mentions that Mr. Alvarez had a mental deficiency that needed to be addressed in a closed setting. And so... Does that report, how did that get into the records? It's, my understanding is that at the very least, it was referenced at sentencing. So there's, there's a notice in the record where the court says, I've considered the probation report and I believe... I thought the report in the record was different than the pre-sentence report. The report I read that talked about a medical exam and this person has some mental health issues. Do you know which one I'm referring to? I, I believe they're one in the same. Oh, all right. All right. So there's this, that reference to the medical or the, the mental deficiency that should be addressed in a closed setting. And that's from the probation report. And so all of... Now, do you think that's, that was enough to tip off the judge that this guy should have, that this particular defendant should have had a competency evaluation attempt? At least it should have informed trial counsel, who is also seeing... That's a different question. Symptoms. Well, as for the judge, we don't have a procedural incompetency claim here. The question is whether trial counsel should have been tipped off by these red flags. And I think when we look at the probation report, in addition to these, these other snippets, certainly strange physical behavior and the defendant being characterized as nervous and odd and, and these other symptoms seems to indicate that there was something more there. So on your substantive claim, we'd have to do, if we were to agree with you that there was, I guess, a violation, that he was, there was evidence that he was substantively incompetent. You still have to go to Breck, right? You'd have to do a Breck... No, a substantive incompetency is structural. Structural? Right. If, if, Your Honor, if the, if the petitioner was in fact incompetent at the time of trial, then there's no prejudice analysis. But if we do IAC, we need to find prejudice. The prejudice determination would be that it would be, there's reasonable probability that had he been evaluated at the time of trial, he would have been determined to be incompetent. And the prejudice analysis for IAC goes only to whether he would have been declared incompetent. It doesn't go to other things. One of the things that he turned down a pretty good deal. He turned down an eight-year, it started out to be seven, but it bumps up here, but he turns down an eight-year deal. And in return, he gets life in prison plus a zillion years. Certainly, and that may inform the prejudice analysis if, the question is, if he had been competent at the time of trial. The question is really, is there a reasonable probability that he would have been found competent or incompetent at the time of trial? And if so, perhaps a different disposition. There are some procedural default issues here, is that right? There are. So... Even though the California Supreme Court denied his petition on the merits at the end. Denied the petition on the merits. The parties briefed the procedural issues lightly, a little bit, in district court, but the district court decided not to rule on the procedural issues and denied. Those issues still have to be resolved. Yes, Your Honor. I'm mindful of my time if the court has... We'll make sure you get a chance to respond. Thank you, Your Honor. Thank you, Your Honor. May it please the court, Deputy Attorney General Don Every for respondent appellee. The district court was right when it held that the California Supreme Court's denial of petitioner's incompetency and ineffective assistance of counsel claims was reasonable. Focusing first on the issue of competency. Dusky requires that a defendant be able to understand the proceedings against him and cooperate in his own defense. Pate requires that the trial judge hold a competency hearing when there's a bona fide doubt as to competency. And we have to keep those legal concepts in mind. And here, the record of trial plainly demonstrates that under those standards, petitioner did understand the trial and did cooperate with counsel, and that there would have been no basis to hold a competency hearing. Petitioner testified in his own defense regarding mistaken identity, provided an alibi, and withstood cross-examination. There was nothing out of the ordinary about his testimony. To do this, petitioner must have been able to understand the trial and the charges against him and to cooperate with counsel. And his alibi witness, Larry Batista, later testified consistently with that defense. In fact, a declaration by Mr. Mantegna's defense counsel demonstrates that the alibi theory originated with petitioner and that he connected Mr. Batista to counsel. Mr. Mantegna has added that there was nothing whatsoever in petitioner's demeanor or history or behavior that suggested that he was legally incompetent. The evidence petitioner offers in response, such as the Lavid report, didn't factually contradict any of that. It was undisputed that petitioner suffered from hyperthyroidism at the time of trial, and about nine months after his commitment to prison, the disease required hospitalization. Over the next several years, the disease manifested mental symptoms, such as paranoia. But there's no logical basis to extrapolate backwards from those symptoms to the time of trial in a case like this, where we have a record of the trial and testimony, competent, cogent testimony by the defendant. Nor was the state court's decision an unreasonable determination of facts. Respondent did not challenge Dr. Lavid's credibility or challenge the veracity of the medical records that he relied on. The state court simply had to weigh the overwhelming evidence, contemporaneous evidence, of competency against a backward-looking analysis from 2013, over a decade later, saying the converse. So it was reasonable for the state court, for the California Supreme Court, under these facts to determine that the uncontroverted trial record and the Mantegna's declaration were dispositive. The ineffective assistance of counsel claims failed for much the same reason, as a strickland overlay on the competency issue. There was no contemporaneous evidence of incompetency. So Mr. Mantegna's omission of a request for a competency hearing couldn't have fallen below an objectively reasonable standard of representation. Did he get any obligation to investigate? Well, we know that he knew that petitioner had the... Well, his declaration didn't seem to elaborate too much on what he learned about his background. Well, he questioned Mr. Alvarez on direct about that disease, because he presumably wanted... Well, prior to trial, did he do anything to uncover what his medical records would show about his condition? It's not clear from the record, although we do know that he stated in his declaration that petitioner's family didn't present any kind of claims of mental illness. So that suggests that he spoke to the family. And it also, as I said, the fact that he questioned him on direct about that... Do we know if he did anything to understand the nature of Graves' disease? What it can do to somebody? We don't know his... We don't know Mr. Mantegna's level or depth of knowledge on the medical issue. Do we know if he talked to anybody or talked to a doctor? The declaration simply says that there was nothing in petitioner's behavior that would have caused him to have doubt. And we know that... He suspected something was wrong with him, because he stood up in front of the jury at the beginning of the trial and said... Right. We know that there were... We know that the evidence systems inform us about what the temporary, the early attorneys that were dismissed said about him being cuckoo and all kinds of colloquialisms. That he had, obviously, some kind of mannerisms that were drawing attention. And I think Mr. Mantegna did a very reasonable thing in inquiring about those before the jury to explain why he was fidgeting the way that he was. But none of that goes to the analysis of competency. The question for competency and for ineffective assistance of counsel overlaid on that is whether the individual understood the trial and could cooperate with counsel. And the record plainly tells us that he could and that he did. And so Mr. Mantegna didn't have any duty to become a medical doctor and go into the details of Graves' disease beyond what the legal test requires, which was cooperation and understanding. And I would add that I think if Mr. Mantegna had requested a competency hearing, we have a very good idea of how that would have played out. Because we have petitioner's behavior in his waiver of speedy trial hearing, his testimony, his decision to invoke his absolute right to testify. All of his in-court behavior is probably a good guide for us to know how a competency hearing would have gone down. He would have been in court and the trial judge would have asked him a series of questions and he would have answered them cogently, as he did during the rest of the trial. And so that goes to the prejudice analysis, the second prong of Strickland. So given all of that, I'd like to briefly address the evidentiary hearing issues that opposing counsel raised in terms of the California Supreme Court. Initially, I would argue that the omission of an evidentiary hearing in California Supreme Court should be analyzed under D-1. It's not a D-2 issue. This is a question of does the United States Supreme Court Authority require a state court to hold an evidentiary hearing? And the answer to that is no. Brumfield indicates that the underlying factual conclusions that a state court reaches is a D-2 issue, whereas the adequacy of the procedures it uses is a D-2 issue. And the decision whether to hold an evidentiary hearing is the latter. But without belaboring that too much, I would say that we win even if we look at that issue as a D-2 question. Because under cases like Taylor and Hibbler, the issues for omission of an evidentiary hearing go to, you know, is there a credibility contest? Do we have witnesses saying different things that we have to weigh? And here, there was none of that. There was undisputed evidence in the form of the trial record. And Dr. Lavid's analysis was not factually in dispute, only his legal conclusion as to competence he was. And I would note that what's really telling about Dr. Lavid's report is that it's based on this 2013 interview. But nowhere in the report... But shortly post-trial. Okay, but why didn't you ask the real meat of the questions? And so for that reason, I don't think that the report even presents a factual dispute for the California Supreme Court to hold an evidentiary hearing and adjudicate. This is a legal issue. And the evidence was overwhelmingly in support of the fact that he was competent. So in conclusion, the California Supreme Court's denial of these claims was a correct application of U.S. Supreme Court authority and a reasonable determination of facts, given the evidence, most notably the trial record. Thank you. Just briefly, thank you, Your Honors. I would like to go back to what counsel for respondents said. The ultimate question is, did Mr. Alvarez understand the trial? And the evidence shows that he suffers from severe, longstanding mental health problems that affect his ability to rationally understand what is going on. And the state court decision denying his petition was unreasonable. There was no order to show cause. I think there were credibility disputes. I respectfully disagree with my opposing counsel on that. And for all these reasons, I ask that the court find the case be remanded to the district court for further proceedings. Thank you.
judges: W. Fletcher, Paez, Gleason